

# NUMBER 13-18-00527-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF A.M.L.M., T.W.M., S.L.M., CHILDREN

### On appeal from the 24th District Court
### of Victoria County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Hinojosa**
**Memorandum Opinion by Justice Hinojosa**

Appellants E.L. (Mother) and L.A.M. (Father) appeal from a judgment terminating their parental rights to fifteen-year-old A.M.L.M. (Doe 1), thirteen-year-old T.W.M. (Doe 2), and eleven-year-old S.L.M. (Doe 3).[1]   *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (best interest ground), (b)(1)(O) (family service plan ground) (West, Westlaw through 2017 1st

---

[1] In appeals involving the termination of parental rights, the Texas Rules of Appellate Procedure require the use of an alias to refer to a minor.   TEX. R. APP. P. 9.8.   We may also use an alias "to [refer to] the minor's parent or other family member" to protect the minor's identity.   *Id.*

C.S.).   Mother and Father both challenge the legal and factual sufficiency of the evidence supporting the family service plan ground.   Additionally, in what we construe to be Father's second issue, he contends that "[n]othing in the affidavit filed by the [Texas] Department of Family Services shows that reasonable efforts were made to prevent the removal of the children from their home."[2]   We affirm.

## I. BACKGROUND

At the termination trial, the trial court heard from thirteen witnesses who may be broadly categorized as:   (1) employees of the Texas Department of Family and Protective Services (Department); (2) counselors; (3) community members who interacted with the parents; (4) W.M., the children's paternal grandmother (Grandmother); and (5) both parents.

## A.   Department Employees

Nikki Carver,[3] an investigator with the Department, recalled that, since 2005, the

---

[2] Section 262.113 provides:

An original suit filed by a governmental entity that requests to take possession of a child after notice and a hearing must be supported by an affidavit sworn to by a person with personal knowledge and stating facts sufficient to satisfy a person of ordinary prudence and caution that:

(1) there is a continuing danger to the physical health or safety of the child caused by an act or failure to act of the person entitled to possession of the child and that allowing the child to remain in the home would be contrary to the child's welfare; and

(2) reasonable efforts, consistent with the circumstances and providing for the safety of the child, have been made to prevent or eliminate the need to remove the child from the child's home.

TEX. FAM. CODE ANN. § 262.113 (West, Westlaw through 2017 1st C.S.).

[3] Carver's previous last name was Nagel.   We will refer to her as Carver for simplicity.

Department had initiated eighteen investigations into the children's welfare and the parents' conduct. Those investigations closed without escalating to a proceeding to terminate paternal rights. The nineteenth investigation began because the Department received an allegation that both parents were using methamphetamines and taking pills on a daily basis and in the children's presence. In an affidavit in support of removal,[4] Carver stated:

> On July 10, 201[7][,] I called law enforcement to assist us at the [parents'] address . . . . I spoke with Officer Parker and he stated that they deal with [the parents] all of the time. Officer Parker stated that [Mother] is currently pregnant and he does feel that they are using methamphetamines just by their behaviors. He stated that things have gotten bad between [Mother] and [Father] and they are always calling law enforcement to come to the residence due to arguments and [Mother] calling them stating that [Father] is driving with the kids under the influence. Nobody was at the residence when we attempted contact. I then went across the street to the gas station that the kids have been known to hang out at. While at the gas station I spoke with a neighbor and he stated that he talked to [Father] this morning and he did not appear to be under the influence but that he uses synthetic marijuana. He stated that [Mother] will do $40-$80 a day in pills and will sell her food stamps, steal, and solicit herself. He stated that she also has the kids stealing for her and soliciting themselves for money. He stated that he knows that [Father] had the boys this morning but stated that [Mother] is trying to get all of the kids.

> On July 12, 201[7][,] I received a call and a text from [Mother]. At this time I did not call her back. I called and texted [Mother] on 7/13/1[7] and told her that I needed to see her [and] the kids and sorry that I did not call her back the day before. She set an appointment with me for 7/13/17 at 1:30. [Mother] did not show up to her appointment. I texted [Mother] and asked where she was. She replied that she had an emergency and that she would call when she was finished. A call was not received from her.

> On July 14, 2017[,] I received a call from [family friend]. She

[4] Carver's affidavit in support of removal was initially filed along with the Department's "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship and Order Setting Hearing." Approximately a year later, the trial court admitted, without objection, Carver's affidavit in support of removal at the bench trial on the Department's termination petition.

identified herself as being the one that [Mother] and [Doe 3] have been staying with.   She stated that they had been staying with them for about 2 weeks.   [Family friend] stated that [Father] is on [s]ynthetic [m]arijuana and [m]ethamphetamines.   She stated that [Mother] is not doing the right things right now either.   She stated that [Doe 3] told her that if they don't have any toilet paper and [Father] goes to the restroom, that he will wipe with her blanket and then cover her back up with the blanket.   [Family friend] stated that [Mother] solicits herself for sex so that she can get her drugs.   She stated that [Mother] is 4 months pregnant.   [Family friend] stated that [Mother] will leave and stay gone until early hours of the morning.   She stated that [Mother] stole her [c]lonopam [sic] pills.   [Family friend] stated that [Father] took [Doe 1] to a house . . . last week and bought drugs.

On the above date, myself and co-worker Kelli Williams went by the residence and the children were outside.   We went around the block and by the time we got to the house the kids were not outside.   We knocked on the door and [Father] came out of the residence.   It was very clear that [Father] was under the influence of some sort of drug. He was slurring his speech, could not hardly stand up, and could not walk.   He did not know where his children were.   He went back inside and looked around and said they were not home.   While waiting for [Father] to find his kids, one of the children, [Doe 1] came home riding his bicycle.   I asked [Doe 1] where [Doe 3] was and he stated that he did not know but must be in the house.   I sent him into the residence to find [Doe 3] since [Father] could not find him. [Doe 1] came back out and stated that she was not at the residence and he did not know where she was but she might have gone to a friend's house. [Father] called [Mother] and within a short time frame she came walking to the house from down the street.   She would not speak to me at all but spoke with Kelli Williams.   She never told Kelli anything but we discussed with her that [Father] was highly under the influence but she would not acknowledge it.   [Mother] began speaking to me with vulgarity and calling me vulgar names.   Law enforcement told [Mother] that if she did not go inside the home and stop referring to me with vulgarity, she would be arrested.   [Mother] told us that we had to leave and she went back inside her residence.   During this time [Doe 3] came walking down the road and I spoke briefly with her and asked her how she was doing.   She stated that she was good.   [Doe 3] went inside the residence.   At this point, I and coworker Williams went back to the car.   While we were getting [ready] to leave [Mother] came outside and apologized and gave co-worker, Kelli Williams a written letter which stated that she needs help to get away from [Father] and that she would come to the CPS office.   We told her to come to the office at 2:00 and to bring all of her kids.   [Mother] never came to the office and stopped answering her phone.

4

Carver explained that the first eighteen investigations did not escalate to termination proceedings because the parents cooperated with family-based services during those investigations. The parents stopped complying with the family-based services, which according to Carver, necessitated termination proceedings.

On August 21, 2017, the trial court signed an order designating the Department as the temporary managing conservator for the children. Kay Shook, a conservatorship caseworker with the Department, testified that, upon removal from the parents' custody, the Department initially placed the children in a shelter. Later, the children were placed with Grandmother.

Shook identified family service plans that required the parents to, among other things, attend counseling sessions and parental skills classes, submit to drug testing, and pay child support to the Department. The parents, according to Shook, failed to satisfy several of the requirements in the family service plans. Mother missed three drug tests, which according to Shook are presumed positive. Additionally, Mother tested positive for benzodiazepines on September 15, 2017 and December 14, 2017; she tested positive for opiates on June 8, 2018. Mother failed to provide a valid prescription to account for the detection of benzodiazepine. Father missed at least one drug test, but he tested negative for any drugs at another drug test. Shook stated that the negative drug-test result may have been because synthetic marijuana is not identified by the drug test that was administered to him. As of April 2019, Father had paid only $111.69 in child support.

Shook testified that Doe 1 was at risk of losing four front teeth and that dental care provided during the removal period prevented such loss. However, on cross

5

examination by the parents, Shook admitted that there was no evidence that the parents had left the children in a situation that caused them physical injury or emotional harm, instead removal was initiated because of "non[-]cleanliness of the home" and illegal drug use. Shook identified pictures of the home taken upon the children's removal and noted that the home "smelled like smoke of some sort" and "had a very foul odor." She also identified pictures that she took of a motel room where the parents stayed for one night during the removal period.[5] The pictures depict fast-food boxes, empty cups, and soda cans on the desk. Shook testified that a trashcan was full of hair and opined that Father had shaved his head.[6]

## B.    Community Members

Christine Jackson, a Court Appointed Special Advocate (CASA), met with the children and parents over the year between the children's removal and the termination trial. She personally observed approximately six or seven visits between the children and the parents during the separation period. Jackson recounted that after being initially placed at a shelter, the children were relocated to live with Grandmother in the trailer home where they previously resided with the parents. Jackson testified that Doe 1 and Doe 2 want their parents' parental rights terminated. Doe 2 specifically prefers the Grandmother's structure—even though it at times causes friction between the two—as opposed to the chaotic household run by the parents. As for Doe 3, Jackson testified:

---

[5] Before the children's removal, the parents and children resided in a trailer home owned by Grandmother. After removal, the parents were displaced from the trailer home so that it could eventually be occupied by Grandmother and the children. Monica de la Santos, a general manager at Motel 6, testified that the pictures Shook took were from the same motel location where the parents had stayed a night.

[6] The June 8, 2018 drug test Mother failed used a hair follicle to detect drug use.

[Doe 3's] opinion is different than her brothers. I don't know if [Doe 3] fully understands the situation because of her age. She—the brothers would like termination. The—[Doe 3] does not want that because she would still like to visit with her mother. She would like to stay where she is with her grandmother, but she doesn't want to never see her mother again.

Jackson believed that it would be in the children's best interest if the parents' parental rights were terminated because the parents' relationship with the children was unstable and chaotic. Jackson also believed that the parents posed a danger to the children when they were under the influence of drugs and by associating with drug dealers. As an example, Jackson recalled that, during one of the parents' visits, Mother fell asleep with a knife in her hand as she was cutting summer sausage.

Michael Brownie owns Cowboy Containment, a business that employed Father during part of the separation period. Brownie recalled that upon learning of the children's removal, he donated material and paid for Cowboy Containment employees to repair the trailer home where the family had resided. Father was fired because he disobeyed workplace safety rules by taking Mother into secure work areas.

Jose Trejo, a detective with the Victoria Police Department, testified that, on March 8, 2018, he was dispatched to perform a wellness check on an individual reported to have passed out in a vehicle. Trejo roused Father, the vehicle's occupant, and he noticed the smell of synthetic marijuana when Father exited the vehicle. In Trejo's opinion, Father was intoxicated based on his speech, stance, and slow reaction. Father consented to Trejo searching his person, and Trejo found a synthetic marijuana cigarette. Around the time Trejo encountered Father, Mother telephoned the police station and relayed to Trejo that Father "was an avid synthetic user."

7

Rick Williams, a pharmacist at Roger's Pharmacy, testified that he had known mother for approximately ten years. Williams recalled that Mother would ask for refills earlier than they were due, and at times, would slur her speech.

## C.    Counselors

Wendy Holder, a licensed professional counselor (LPC) with Reclamation Counseling Center, counseled Mother over the course of thirteen sessions and reviewed records for both parents. Holder testified that the parents missed three of ten required "life skills" classes, which caused them to not complete the course. As for Mother, Holder did not recommend reunification for two reasons. First, Holder opined that "the family role scale is elevated." This elevation resulted from Mother "dumping" on the children by using them for comfort and emotional support. Such a dynamic leads to "adultification" of the children and limits their social engagement outside the home. Second, Holder believed that Mother suffered from histrionic personality disorder. According to Holder, Mother seeks attention from people and treats people like they are her best friend when they are not. Holder recalled that Mother was prescribed Zoloft, clonazepam, and Vistaril. At some counseling sessions, Holder observed Mother stumble down the hall and use the wall for support. Holder recommended against reuniting Mother with the children because she showed no progress in five months of counseling and could not meet the children's emotional needs.[7]

John Lenihan, a LPC with Reclamation Counseling Center, counseled Father over the course of fifteen sessions. Father failed to attend four counseling sessions.

---

[7] Lyndal Rosenthal, a LPC with Olive Branch Hope Center, briefly testified, and she echoed Holder's recommendation against reunification.

Lenihan testified that Father failed to meet his treatment goals, those being to: (1) increase the accountability of behavior and abide by the rules in our of society, (2) improve self-awareness and become less self-indulgent by showing more respect to others, (3) take responsibility for his own actions, express remorse and not project blame on others, and (4) demonstrate a capability for consistent employment and show financial and emotional responsibility towards his wife and children. In Lenihan's opinion, Father could not provide a stable home environment for himself, much less the children.

**D.    Grandmother**

Grandmother has cared for the children on two prior occasions before the current placement. She opined that the children's relationship with their parents was volatile. In Grandmother's opinion, terminating the parents' parental rights would be in the children's best interest because she does not believe that the parents can provide for the children and it would prevent Mother from going to the children's school and agitating them.

**E.    Parents**

Mother denied many of the allegations raised by the Department's witnesses. She explained that Father was not under the influence of drugs when Carver and Williams visited the home. Father, according to Mother, was napping after having worked in the yard when Carver and Williams woke him up. Mother also explained that she underwent a tubal ligation surgery shortly after Doe 3's birth. Therefore, reports of a recent pregnancy would be false. Mother also denied using methamphetamine and engaging in prostitution. She characterized Robert Radar, the neighbor referenced in Carver's

9

affidavit in support of removal, as "the neighborhood drunk." Mother admitted that the results of her most recent drug test, which used Mother's hair follicle to test for drug use, were positive. Moreover, she had been homeless for approximately eight months before the termination trial.

Father testified that in the preceding year he had transitioned through three consecutive fulltime jobs. When asked to explain how he came to possess the synthetic marijuana that Trejo found on his person, Father explained that "someone was in my vehicle" and "dropped it in my vehicle." Father admitted to not attending couples counseling and stated that he "tried to" inform Shook every time he moved while the Department was the children's managing conservator.

## F.    Termination Judgment

On September 19, 2018, the trial court signed a judgment that found by clear and convincing evidence that termination of Father's and Mother's parental rights was in the children's best interest and was warranted because the parents failed to comply with the family service plans. *See id.* § 161.001(b)(2) (best interest ground), (b)(1)(O) (family service plan ground). Mother moved to a new trial on the ground that there was insufficient evidence that the children were neglected or abused at the time of removal. The motion for new trial was overruled by operation of law. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

In the parents' first issue, they challenge the legal and factual sufficiency of the evidence supporting the family service plan ground.

## A.    Standard of Review

The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true. *Id.*

We perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). If, in weighing disputed evidence, the factfinder could have reasonably resolved the conflicts to form a firm conviction that the allegations constituting the grounds for termination were true, then the evidence is factually sufficient, and the termination findings must be upheld. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). On the other hand, evidence is factually insufficient if the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d at 266.

## B.    Applicable Law

Because of the fundamental rights at issue, due process requires that termination be supported by clear and convincing evidence. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence

11

is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2017 1st C.S.); *In re J.F.C.*, 96 S.W.3d at 264.

Before parental rights may be involuntarily terminated, the trier of fact must find two elements by clear and convincing evidence:  (1) that the parent committed one of the statutory grounds for termination found in section 161.001(b)(1) of the family code; and (2) that termination is in the child's best interest.  TEX. FAM. CODE ANN. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).

Relevant to this proceeding, section 161.001(b)(1) provides that termination of parental rights is warranted if the trier of fact finds by clear and convincing evidence, in addition to the best interest finding, that the parent has:

> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the **abuse or neglect of the child**[.]

TEX. FAM. CODE ANN. § 161.001(b)(1)(O) (emphasis added).

## C.    Analysis

The parents do not challenge the evidence supporting their failure to comply with the requirements in the family service plans.  Instead, they contend that the evidence is legally and factually insufficient to support a finding that the children had been "abused or neglected" at the time of their removal. *Id.*  As authority, Mother references *In re E.C.R.*, 402 S.W.3d 239, 243–50 (Tex. 2013) for the proposition that subsection O

12

requires clear and convincing evidence of risk of abuse or neglect. The Department responds that the parents read too much into *E.C.R.*, and it refers us to *In re B.S.*, No. 11-12-00369-CV, 2013 WL 3878586, at *1–3 (Tex. App.—Eastland Jul. 25, 2013, no pet.) (mem. op.), which provides in relevant part:

> The father relies upon the lack of evidence showing actual abuse or neglect of B.S. The Texas Supreme Court has recently rejected such a contention when it interpreted the "abuse or neglect" provision of Section 161.001(1)(O) in *In re E.C.R.*, 402 S.W.3d 239 (Tex. 2013). The court determined "that subsection O requires proof of abuse or neglect," but it held that, considering the use and meaning of those terms in context of the Family Code, "abuse or neglect" in subsection O can be read to include "risk." *E.C.R.*, 402 S.W.3d at 246. The *E.C.R.* court determined that the conduct described in Section 161.001(1)(O) was established as a matter of law under the circumstances in that case, which included no actual abuse or neglect of the child at issue but did include an immediate danger to the child's physical health or safety, a need to protect the child, and a substantial risk of a continuing danger if the child were returned home. *Id.* at 248–49.

*In re B.S.*, 2013 WL 3878586, at *12.

In *E.C.R.*, the court found the affidavit in support of removal sufficient to support termination under subsection O. Specifically, the court observed:

> Here, the Department's evidence in support of removal included an affidavit showing that the department received a referral of physical abuse of Y.C.[, a four year old child]. A witness had seen M.R.[, the mother,] punching Y.C. and dragging her by her hair. Y.C. had sustained injuries. M.R. denied the abuse, but she was arrested and charged with intentional bodily injury to a child. She had been involved in a prior CPS case involving physical abuse of her older son, who was in the foster parents' permanent conservatorship. She left E.C.R.[, an eight month old child,] with her boyfriend, who was not E.C.R.'s father, had an extensive criminal history, and had physically abused her. She was incarcerated and unable to care for E.C.R. This affidavit, even if not evidence for all purposes, shows what the trial court relied on in determining whether removal was justified. That court found sufficient evidence to satisfy a person of ordinary prudence and caution that E.C.R. faced an immediate danger to his physical health or safety, that the urgent need to protect him required his immediate removal,

13

and that he faced a substantial risk of a continuing danger if he were returned home—findings unchallenged by M.R. [footnote 8]

*In re E.C.R.*, 402 S.W.3d at 248.[8]

We conclude that *E.C.R.* does not support the parents' legal and factual sufficiency challenge. While the allegations in Carver's affidavit in support of removal do not recount physical abuse as those in the affidavit in *E.C.R.*, there is evidence of the risk of neglect to the children. Carver's affidavit states that Mother abuses methamphetamines and that she solicits herself, sells food stamps, and steals to support her drug addiction. Father, according to Carver's affidavit, abuses synthetic marijuana. A family friend stated to Carver that Father used Doe 3's blanket as toilet paper, Doe 1 accompanied Father on his drug purchases, and Mother would leave and stay gone until the early morning hours. Shortly before the children were removed, Carver personally observed Father exhibiting slurred speech and an inability to stand up and walk. Carver's observations coupled with Father's inability to locate the children led Carver to believe that Father was under the influence of drugs. Lastly, Carver recounted eighteen previous investigations started by the Department into the parents. These allegations—"even if not evidence for all purposes"—constitute legally sufficient evidence that the children were at risk of neglect at the time of removal. *See id.*; *see also* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). Even

---

[8] In footnote 8 of *E.C.R.*, the court referenced *Dancy v. Daggett*, 815 S.W.2d 548, 549 (Tex. 1991) and *In re Steed*, No. 03-08-00235-CV, 2008 WL 2132014, at *1 (Tex. App.—Austin May 22, 2008, orig. proceeding [mand. denied]) (mem. op.) for the proposition that mandamus relief may be available to correct an erroneous temporary order because such orders are not subject to interlocutory appeals. Under a "but see" signal in the same footnote, the *E.C.R.* court referenced section 262.112 of the family code, which provides: In any proceeding in which an expedited hearing is held under Subsection (a), the department, parent, guardian, or other party to the proceeding is entitled to an expedited appeal on a ruling by a court that the child may not be removed from the child's home. TEX. FAM. CODE ANN. § 262.112 (West, Westlaw through 2017 1st C.S.).

considering Mother's denial of drug abuse and solicitation and her excuse that Father was addled after having just awakened from a nap—not under the influence of drugs—when Carver and Williams visited the home, the trial court could have reasonably resolved the conflicts to form a firm conviction that the children were at risk of neglect.[9]  *See In re C.H.*, 89 S.W.3d at 18–19; *see also* TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

We overrule the parents' first issue.[10]

### III. SUFFICIENCY OF CARVER'S AFFIDAVIT IN SUPPORT OF REMOVAL

Father's second issue, as we construe it, is closely related to the parents' first issue.  In Father's second issue, he contends that nothing in Carver's affidavit in support of removal shows that reasonable efforts were made to prevent the removal of the children from their home.  *See* TEX. FAM. CODE ANN. § 262.113(b).  Father further argues that the trial court's termination determination is infirm and must be reversed because the children were improperly removed.  We read *In re E.C.R.*, 402 S.W.3d at 248, n.8, as suggesting that complaints regarding the adequacy of an affidavit in support of removal may be addressed immediately.  Moreover, Father points to no adverse ruling regarding Carver's affidavit in support of removal.  *See* TEX. R. APP. P. 33.1, 38.1(i).  To the contrary, it was admitted at the termination trial without objection.  Accordingly, we

---

[9] Although Father filed a motion for new trial, his motion did not challenge the factual sufficiency of the evidence supporting termination as Mother's motion did.  Thus, Father failed to preserve a factual sufficiency challenge.  *See* TEX. R. CIV. P. 324(b)(2); *In re D.J.J.*, 178 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2005, no pet.).  Even had Father preserved such a challenge, it would have failed.

[10] We emphasize that the parents have asserted a limited legal and factual sufficiency challenge that focuses on the final clause of section 161.001(b)(1)(O) of the family code.  Even had the parents argued that there is legally and factually insufficient evidence that termination of their parental rights was in the best interests of the children, our disposition would remain the same.  The record contains legally and factually sufficient evidence that termination was in the children's best interest.  *See generally, In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) ((citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)).

15

conclude that Father's complaint regarding Carver's affidavit in support of removal was rendered moot when he failed to when he failed to challenge it immediately, and even if not moot, it is unpreserved.

We overrule Father's second issue.

### IV. Conclusion

The judgment of the trial court is affirmed.

LETICIA HINOJOSA
Justice

Delivered and filed the
14th day of March, 2019.